**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MANHATTAN COURTHOUSE**

| | |
|---|---|
| Ryan Oyler, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>                - against -<br><br>NFL Enterprises LLC,<br><br>                      Defendant | 1:22-cv-08413<br><br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. NFL Enterprises LLC ("Defendant") markets and sells a subscription service known as NFL+ Premium ("NFL Plus (+)," "Subscription" or "Service").[1]

2. NFL+ is a subscription service operated by the National Football League ("NFL") which provides streaming of radio and television broadcasts of NFL games along with other content from NFL Films and the NFL Network.

**I.  SUBSCRIPTION ECONOMY**

3. NFL Plus is part of the "subscription economy," or the exchange of content, products or services for recurring, scheduled payments.

4. Subscription services have grown over four hundred percent in the past ten years and will reach to $1.5 trillion by 2025.

5. Companies value subscriptions to provide consistent revenue, customer data and because they are "sticky" and "lock in" customers.

---

[1] Formerly known as NFL Game Pass.

6.  Consumers may value subscriptions to minimize friction of routine transactions.

## II. PROBLEMS WITH SUBSCRIPTION ECONOMY

7.  The subscription economy is based on negative option marketing, where the customer's silence, or non-rejection of goods or services constitutes acceptance.

8.  The name comes from the fact that to cancel their enrollment or agreement, the customer must exercise a "negative option" to affirmatively opt-out of the transactions.

9.  The Federal Trade Commission ("FTC") identified four types of negative options.

10. Continuity plan consumers agree in advance to receive periodic shipments of goods or provision of services and incur charges until they take steps to cancel the arrangement.

11. Automatic renewal plans involve the automatic renewal of contracts at the end of a fixed period unless consumers instruct otherwise.

12. Other types include free-to-pay or nominal fee-to-pay conversion plans.

13. These involve the customers receiving a good or service for a free or nominal price for an introductory period.

14. However, if the customer does not affirmatively cancel their enrollment, they will be charged a significantly higher amount for the product or service.

15. A 2018 report from the Better Business Bureau ("BBB") shows losses in "free trial offer" cases pursued by the FTC over the last ten years exceed $1.3 billion.

16. From 2015 through 2017, the BBB received 36,986 complaints about "free trials."

17. Data from the FBI Internet Crime Complaint Center reveal complaints are rising.

## III. DEFENDANT'S DECEPTIVE SUBSCRIPTION PRACTICES

18. In July 2022, Defendant autoconverted and autorenewed GamePass subscribers, including Plaintiff, to a different, new service, known as NFL+, without their clear knowledge or

consent and charged them a year's membership all at once.

19. This autorenewal was in contrast to subscription services designed to let customers "opt-in" to automatic renewal after an initial term or at other points in their usage.

20. Defendant's default autorenewal takes advantage of consumer inertia, as psychological studies have shown autorenewal users are seven times more likely to "continue," or not cancel their subscriptions, compared to if a subscription service was set to automatically cancel ("autocancel").

21. Researchers have labeled this phenomenon as "status quo bias," making consumers susceptible to "sludge," so that they are unlikely to depart from a default option, even where it would be in their interest to do so.

22. For example, study participants self-estimated there was an 80% chance they would complete a mail-in form to receive a refund, even though the final submission rate was only 30%.

23. These studies show that consumers tend to procrastinate on mundane tasks, especially where they are deemed boring or difficult, which includes cancelling subscriptions.

IV. CANCELLATION OBSTACLES

24. Defendant has a scientifically designed process to reduce "churn," an industry term for customer cancellation rates.

25. These mechanisms have been developed and tested by experts in behavioral science and psychology and include interrelated manipulative design tactics referred to as "dark patterns."

26. The result is that Defendant can scientifically ensure that no more than a fixed percentage of users will successfully navigate the gauntlet of obstacles laid down in front of them if they decide to cancel.

27. These methods were successful in preventing Plaintiff from cancelling and getting

his money back despite his significant efforts to this effect.

### A. No Obvious or Apparent Cancellation Method

28. Upon learning that his GamePass subscription was being converted into NFL+, Plaintiff went to the service's website to cancel and prevent any charges to his payment method.

29. However, Defendant utilized sophisticated and manipulative design and interface practices to stymie Plaintiff's attempts.

30. This included a link labeled "cancellation" which pulled up instructions that were unclear and non-intuitive such that Plaintiff could not adequately navigate and complete the process.

31. Plaintiff then removed the subscription and payment information from his account, before deleting it entirely.

32. No email confirmation was provided as a result of these steps, which is a common practice on the part of companies in the subscription economy.

33. The purpose of not providing a confirmation email is to avoid the customer retaining a record indicating when they cancelled and having proof, in the likely event the company continues to charge them.

34. When Plaintiff was not charged on August 1, 2022, he believed his cancellation was effective.

35. However, on or around August 24, 2022, Defendant charged Plaintiff's payment information via his PayPal account, even though he removed this payment method from his account prior to deleting his account.

36. The only explanation for this charge is that Defendant failed to remove Plaintiff's account and payment information from their back end systems.

37. Defendant retained the ability to charge him even though he specifically and successfully acted to prevent this.

38. Plaintiff was charged for the service even though he lacked access to any account to use the service he was charged for.

39. No telephone support number existed for NFL+ and none of the help center topics addressed his issue.

40. Plaintiff finally attempted to call one of the only customer support numbers he could find, for the NFL shop.

41. The representative Plaintiff spoke to told him she could not help him about issues related to NFL+ or connect him with anyone who could help.

42. The representative informed him she had received numerous similar calls from customers seeking the same assistance about being refunded the money they were charged.

43. She informed him that all calls were being recorded for quality and training purposes, such that it is reasonable that Defendant's call records can confirm the significant number of affected customers.

B. Inability to Process Natural Language Requests for Cancellation

44. Like many companies seeking to minimize costs for customer service, Defendant uses "artificial intelligence" ("AI") chatbots or email responders with names that appear to correspond to human beings.

45. However, these AI responders are designed to be unable to process anything other than the most basic and simple requests, often repeating boilerplate chunks of text, some of which may be responsive to the customer.

46. In practice, the AI responders are not equipped to adequately respond to customer

requests with keywords such as "cancel" and "refund."

47. Upon information and belief, support requests containing these and other keywords are placed in lower priority queues.

48. The purpose is to cause customers to "give up" out of frustration and eventually cease their attempts at cancellation and getting their money back.

49. Even when actual persons override the AI responders, they are intentionally not provided the training and ability to address issues relating to cancellation and refunds.

50. Plaintiff sought assistance through Defendant's customer support portal by sending an email to NFL support and describing how he had cancelled and removed his account, yet was still charged.

51. About ten days later, he received a response from a chatbot identified as "Jho" on September 11, 2022.

52. Jho indicated a desire to address Plaintiff's request, but stated "we're unable to find your active subscription using your email address."

53. Jho's response misunderstood Plaintiff's request as inquiring how to access NFL+, despite his clear request to cancel his subscription and issuing him a refund.

54. Since Plaintiff did not receive a confirmation of his account deletion, he was unable to provide that information.

55. Plaintiff informed Jho his account could not be located because he deleted it almost two months ago, yet he was still charged.

56. Plaintiff provided Jho his email, name, PayPal information and charge amount and date to facilitate Jho's review.

57. Plaintiff informed Jho he was not asking for help with accessing his account, but to

6

ensure his cancellation was processed and his refund issued.

58. After numerous messages which were ignored by Defendant, Plaintiff received a response on September 22, 2022 from a representative identified as "Kimberly."

59. Kimberly also failed to understand the nature of Plaintiff's request, and understood it as a request for cancellation, writing

> We're sad to see you go but thanks for giving us a try! This is to confirm that your cancellation request has been completed. Your last day of access is on August 24, 2023 and no future payment will be taken moving forward.
>
> I understand the importance of getting a refund for your auto-renewed subscription. Let me check the options for you.

60. Kimberly then recited boilerplate text:

> Please note that our decision to grant or deny refunds will be based on purchase type, time that has elapsed between the purchase date and the initial refund request date, and the circumstances for the refund request. You may be granted a refund based on the following circumstances:
>
> - You made duplicate purchases using multiple registration/login credentials, or
>
> - You are experiencing serious and ongoing technical difficulties For further information, please see our [Refund Policy]

61. Finally, Kimberly informed Plaintiff that:

> We have gone in and opted out of the auto-renew for you. You will not be billed for a renewal of NFL+ in the future. Your access to service will remain active through your paid period. I hope this helps clear things up!
>
> If you have further questions or if we can help with anything else, please let us know.
>
> You may also refer to this Help Center article Here for more information about cancellation.
>
> Thanks for being with us and take care! Best, Kimberly.

62. Plaintiff responded to Kimberly and informed her that she failed to understand the nature of his request, about how he cancelled his account and removed his payment information

7

months ago, and wanted this to be honored.

63. Plaintiff informed her that he did not wish to have access to the NFL+ until August 2023 and that he could not access the service given that he removed his account completely.

64. Plaintiff asked how Kimberly could justify charging him for a phantom account he could not access, and received no adequate response.

65. Kimberly next "ask[ed] for a receipt of the cancellation [he] made," to which Plaintiff responded that he did not receive this from Defendant upon removing his payment information and deleting his account.

66. Moreover, Plaintiff asked why Defendant would charge him for NFL+ when their own records revealed he lacked an account to use the services so he could access the product he was being charged for.

67. Defendant's representative eventually indicated she would work to resolve his request but Plaintiff has received no confirmation his issues were addressed.

68. Defendant's intentionally slow responses are designed to frustrate customers like Plaintiff who seek valid refunds of services they did not sign up for, and who have cancelled their services.

69. Defendant maintains customer billing information in its back end system even after customers like Plaintiff affirmatively remove this from their accounts and their accounts entirely.

V. **CONCLUSION**

70. Defendant makes other representations and omissions with respect to the service which are false and misleading.

71. Plaintiff paid more for the Service than he would have paid had he known the above-referenced facts, and would not have purchased it or would have paid less.

72. As a result of the false and misleading representations, the Subscription is sold at a premium price, approximately no less than $85.00 per year, excluding tax and sales, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

73. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

74. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

75. Plaintiff Ryan Oyler is a citizen of Florida.

76. Defendant NFL Enterprises LLC is a Delaware limited liability company with a principal place of business in New York, New York, New York County.

77. The sole member of NFL Enterprises LLC is NFL Ventures, L.P., a Delaware limited partnership, with a principal place of business in New York, New York, New York County.

78. The sole member of NFL Ventures, L.P. is the National Football League, Inc., a New York corporation with a principal place of business in New York, New York County, New York.

79. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

80. The members of the class Plaintiff seeks to represent are more than 100, because the number of NFL+ subscribers are in the millions in the States covered by Plaintiff's proposed classes.

81. Venue is in this District with assignment to the Manhattan Courthouse because Defendant's principal place of business is in New York County, which is where the decisions and policies with respect to NFL+ were made, and where Plaintiff's payment was physically received

by Defendant, at its servers located in its main office.

## Parties

82. Plaintiff Ryan Oyler is a citizen of Winter Garden, Orange County, Florida.

83. Defendant NFL Enterprises LLC is a Delaware limited liability company with a principal place of business in New York, New York County, New York.

84. As football is America's most popular sport, the NFL is the dominant professional sports league.

85. Defendant's NFL+ subscription service has millions of users.

86. While most users presumably like the service, a small percentage regularly decide it no longer interests them and they seek to cancel it.

87. Plaintiff subscribed to GamePass in 2021 but decided to cancel it in 2022 upon the pending conversion into NFL+.

88. Plaintiff subscribed to the Subscription at or exceeding the above-referenced price.

89. Plaintiff would not have subscribed to the Service if he knew he would not be able to unsubscribe and cancel his subscription and not be charged further.

90. Plaintiff would not have subscribed to the Service or would have paid less if he knew he would not be able to stop subscribing and paying for it and that his payment information would be maintained and charged without his consent or even an active account.

## Class Allegations

91. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida and New York Class:** All persons in the States of Florida and New York who subscribed the Subscription during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in

the States of Iowa, Kansas, Montana, Alaska, Arkansas, Wyoming, West Virginia, and Utah who subscribed to the Subscription during the statutes of limitations for each cause of action alleged.

92. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

93. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

94. Plaintiff is an adequate representative because his interests do not conflict with other members.

95. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

96. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

97. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 and 350 and
Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"), Fla Stat. §§ 501.201 et seq.</u>

98. Plaintiff incorporates by reference all preceding paragraphs.

99. Plaintiff believed that he could cancel the service which would stop him from being charged.

100. Plaintiff did not expect his subscription would autoconvert and autorenew without his consent.

101. Plaintiff believed that after he removed his account and payment information, there

11

would be no way for Defendant to continue charging him.

102. Plaintiff and class members would not have subscribed to the Service or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

103. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

104. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

105. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

### Conversion

106. Defendant retained and charged Plaintiff's payment information after he removed it from their system.

107. Plaintiff revoked Defendant's consent to charge him by removing his payment method.

108. Plaintiff demanded Defendant refund his payment, which it failed to do.

### Fraud

109. Defendant charged Plaintiff for a service it knew he was unable to access due to lacking an account.

110. Defendant chose to utilize a customer support system that could not be responsive or understand the issues raised by Plaintiff, about why he was charged after he cancelled his

subscription and removed his payment information.

111. Defendant failed to honor Plaintiff's request to delete his payment information when he canceled his account.

<u>Unjust Enrichment</u>

112. Defendant obtained benefits and monies because the Subscription was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages, statutory and/or punitive damages and interest pursuant to statutory and common law claims;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated: October 3, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com